Ramón Montaner, en su carácter de Administrador del Fondo del Seguro del Estado, recurrente, *v.* La Comisión Industrial de Puerto Rico, compuesta por los Sres. M. León Parra, Presidente, y F. Paz Granela y Juan M. Herrero, Comisionados Asociados, recurrida, y Felícita Díaz Vda. de Aldabalejo, peticionaria ante la Comisión Industrial.

Núm. 173.—*Sometido:* Julio 8, 1939. *Resuelto:* Julio 5, 1940.

*Hon. Procurador General George A. Malcolm (B. Fernández García, Ex-Procurador General,* en el alegato), *E. de Aldrey, Procurador General Auxiliar y Víctor J. Vidal González y G. Atiles Moréu,* Asesores legales los dos últimos del Fondo del Seguro del Estado, abogados del recurrente; *M. León Parra,* abogado de la recurrida; *Francisco A. Quirós Méndez,* abogado de la peticionaria ante la Comisión.

El Juez Asociado Señor Hutchison emitió la opinión del tribunal.

Un patrono envió a un obrero lesionado al dispensario del Fondo del Estado en Corozal con una nota. El practicante a cargo del dispensario le curó la herida, dió al obrero un formulario que debía ser llenado por el patrono, y le dijo que no recibiría nuevas curas a menos que trajera consigo en su próxima visita el informe del patrono. El obrero murió dos días más tarde en un accidente automovilista mientras se dirigía al dispensario con el informe del patrono en uno de sus bolsillos. La Comisión Industrial resolvió que el obrero falleció mientras cumplía órdenes recibidas del Administrador del Fondo del Seguro del Estado, dadas a través del practicante a cargo del dispensario, así como de su

patrono. La Comisión decidió que el obrero tenía derecho a recibir compensación.

De los casos citados por la peticionaria y por la Comisión, los que más ayudan a la solución de este recurso son: *Hammond* v. *Keim,* 258 N. W. (Neb.) 478; *Marks' Dependents* v. *Gray,* 167 N. E. (N. Y.) 181 y *Grieb* v. *Hammerle,* (N. Y.) 118 N. E. 805. En *Hammond* v. *Keim,* el sumario preparado por la corte lee como sigue:

"1. Cuando un obrero abandona su trabajo y se hace cargo de otro, y muere mientras regresa a su antiguo empleo en busca de sus herramientas, bajo la Ley de Indemnizaciones a Obreros no es posible obtener compensación del antiguo patrono, cuando éste no ha tenido deber u obligación alguno con respecto a la devolución de tales herramientas.

"2. Si los asuntos privados del obrero hacen necesario que él dé un viaje que a no ser por ello él no hubiera dado, las lesiones que sufra durante ese viaje no son compensables, a pesar de que en ese momento estuviera haciendo ciertas diligencias para su antiguo patrono, siendo tal hecho meramente incidental al viaje y no el motivo primordial del mismo."

En el curso de su opinión la corte dijo:

"En el caso de autos el interfecto había entrado de manera decisiva en un nuevo empleo, y venía de viaje en busca de sus herramientas. El mero hecho de que debido a una combinación de circunstancias, él tuviera en el camión al tiempo del accidente cierto ácido perteneciente a su antiguo patrono no revive la relación anterior existente entre ellos. El occiso no hubiera hecho el viaje si cualquiera otra persona le hubiese traído las herramientas a University Place, sino que habría hecho el viaje igualmente si el referido ácido no se hubiera colocado en el camión. El fin primordial de este viaje fué buscar las herramientas del finado, y en esto su antiguo patrono no tenía interés alguno."

El sumario del caso de *Marks' Dependents* v. *Gray,* lee así:

"La muerte de un ayudante de plomero acaecida en un choque automovilista, mientras se dirigía en su propio vehículo al finalizar el trabajo del día en busca de su esposa, *se resolvió* que no fué un accidente proveniente de y en el curso del empleo, de conformidad

con la Ley de Indemnizaciones a Obreros, sección 2, inciso 7, y con la sección 10 (Leyes Consolidadas, c. 67), no obstante el hecho de que a este ayudante su patrono le había pedido que llevara consigo las herramientas y que al llegar a su destino hiciera cierto trabajo que requería de 15 a 20 minutos de labor.

"Si el trabajo a realizar por el obrero requiere que éste vaya de viaje, el obrero se encuentra en el 'curso de su empleo' mientras está de viaje, a pesar de que en ese momento él esté efectuando alguna gestión personal, mas, si el trabajo a realizarse no exige que se haga viaje alguno, y el mismo se hubiera siempre hecho no obstante haberse abandonado la parte comercial del mismo, y se hubiera cancelado por haber cesado también el fin privado aunque la gestión comercial permaneciera sin realizar, el viaje al igual que el riesgo son entonces personales."

La opinión emitida por el Juez Presidente Sr. Cardozo, omitiendo los párrafos primero y último, dice:

"(1) Marks era un ayudante de plomero. Su hogar y el sitio donde trabajaba estaban en Clifton Springs, N. Y. El día 16 de abril de 1927 su esposa fué a visitar unos parientes en Shortsville, donde su esposo prometió ir a buscarla en el automóvil de la familia al terminar su labor cotidiana. Al saber que el obrero iba a hacer este viaje, el patrono le pidió que se llevara sus herramientas y arreglara ciertos grifos que no funcionaban bien en una casa en Shortsville. El trabajo a realizar era insignificante y sólo requería de 15 a 20 minutos de labor. No hubiera valido la pena hacer un viaje especial para efectuarlo. Habría sido pospuesto para cualquier otro momento en que se le pudiera combinar con algún otro trabajo, si Marks no hubiera dicho que de todos modos tenía que hacer el viaje. Marks no utilizó el camión del patrono, que era el vehículo utilizado cuando había que hacer algún viaje relacionado con el negocio. Utilizó su propio automóvil o el de su padre, el que se usaba generalmente en asuntos privados de la familia. Nada dijo el patrono respecto a si le pagaría o no por ese pequeño trabajo. Sin embargo, era de esperarse que por cualquier trabajo que Marks hiciera recibiría la paga acostumbrada para horas extraordinarias. Mientras se dirigía a Shortsville y cuando estaba como a una milla de Clifton Springs, Marks tuvo un accidente y murió a consecuencias del mismo.

"Somos de opinión que el accidente no sucedió en el curso de cualquier servicio que Marks tuviera que prestar a su patrono. Él

no hacía el viaje a Shortsville a instancias de su patrono ni con el propósito exclusivo de realizarlo. Lo hacía en cumplimiento de la promesa que había hecho de ir en busca de su esposa al finalizar su labor diaria y de traerla en el carro de la familia. Si antes de salir de viaje se le hubiera dicho que las espitas defectuosas estaban en perfecto orden, él siempre hubiera hecho el viaje. Si por otra parte se le hubiera dicho que su esposa ya había regresado, de seguro que no hubiera hecho el viaje. No fueron los deberes de su empleo los que le obligaron a efectuar el viaje ni a exponerse a los riesgos del mismo. Si ello es así, las lesiones 'no ocurrieron en el curso de su empleo.'

"Muchos casos hay en que los riesgos de la carretera están tan íntimamente relacionados con el empleo que se desempeña, que los mismos sirven de base a una compensación. 'Los riesgos de la calle' son tan variados que no es posible enumerarlos ni predecirlos. El resultado a veces ha sido tal que se ha resuelto que los accidentes más raros han sido incidentales al servicio que se presta. *Katz* v. *A. Kadans & Co.*, 232 N. Y. 420, 134 N. E. 330, 23 A.L.R. 401; *Roberts* v. *J. F. Newcomb & Co.*, 234 N. Y. 553, 138 N. E. 443. No tenemos motivo alguno para desviarnos de estas decisiones o para cercenar mediante excepciones el principio en que se fundan. Las mismas no tocan el caso que está ante nos. Indudablemente el riesgo de tener un choque es uno en que se incurre al viajar por las vías públicas. Lo que nos interesa en este caso es si los riesgos del viaje son también riesgos del empleo. Sentado ese criterio, la norma (*test*) decisiva debe ser si ha sido el empleo o alguna otra cosa lo que ha obligado al obrero a iniciar el viaje y a correr los riesgos del mismo. Un empleado en Nueva York informa a su patrono que va a pasarse las vacaciones en Filadelfia, o quizás en un sitio más distante, digamos en San Francisco o París. El patrono le pide que mientras esté allí visite a un deudor moroso y le exija el pago de su deuda. El viaje a Filadelfia, a San Francisco o a París no forma parte del empleo. Surgiría una cuestión distinta si el cumplimiento de los deberes de un cargo hace que el empleado se desvíe de su ruta y al así desviarse sufre lesiones. Así pues, en el presente caso, surgiría una cuestión distinta si Marks, luego de hacer el viaje a Shortsville hubiera tenido un accidente mientras reparaba los grifos defectuosos. *Grieb* v. *Hammerle*, 222 N. Y. 382, 118 N. E. 805, 7 A. L. R. 1075. El choque ocurrió mientras Marks aún se hallaba en la carretera, como a una milla o menos de su hogar.

"(2) Bajo tales circunstancias, somos de opinión que los riesgos de la carretera nada tenían que ver con el servicio. No queremos decir que la prestación del servicio al patrono deba ser la única causa del viaje, sino que ella por lo menos debe ser una causa concurrente. Para establecer responsabilidad, debe ser posible hacer la inferencia de que el viaje siempre se hubiera efectuado a pesar de haberse cancelado la gestión personal. De los autos que tenemos ante nos no podemos hacer semejante inferencia. Por el contrario la prueba es al efecto de que no se hubiera hecho un viaje especial, toda vez que lo que se hubiera cobrado por el trabajo sería inadecuado. La norma a seguir es en síntesis la siguiente: si el trabajo a realizar por el obrero hace necesario que el viaje se efectúe, entonces el obrero está en el curso de su empleo a pesar de que al mismo tiempo lleve a cabo gestiones personales. *Clawson* v. *Pierce-Arrow Motor Car Co.*, 231 N. Y. 273, 131 N. E. 914. Empero, si la realización del trabajo no forma parte de la necesidad de realizar el viaje, si el viaje se hubiera efectuado siempre, no obstante haber desaparecido la parte comercial, y si el viaje se hubiera cancelado al desistirse del asunto privado, a pesar de no haberse realizado el trabajo, entonces el viaje es personal y personal también el riesgo.

"Aplicando esta norma, resolvemos que Marks no viajaba con motivo de ningún deber impuéstole por su patrono, y que el riesgo de la calle era personal."

Los Jueces Pound y Hubbs disintieron, mas no emitieron opinión disidente.

El sumario del caso de *Grieb* v. *Hammerle,* lee así:

"Un empacador de tabacos que frecuentemente entregaba cigarros a los clientes de exigírselo así su patrono, al pasar por la fábrica una noche vió una luz en el interior y subió. Él y dos amigos hallaron a su patrono amarrando dos cajas de cigarros. El patrono suplicó a su empleado que entregara los cigarros y llevara consigo las cuentas. Al bajar se cayó y murió. De los autos aparece que el occiso dejó a sus amigos en la fábrica cuando salió a hacer la entrega. *Se resolvió* que el finado estaba en el momento del accidente actuando en el curso de su empleo, y que por ende sus beneficiarios tenían derecho a percibir compensación a tenor de las disposiciones de la Ley de Compensaciones a Obreros (Leyes Consolidadas, c. 67); el hecho de que el interfecto prestara servi-

cios en horas extraordinarias a instancias de su patrono no impide que él estuviera protegido por la ley."

De la opinión emitida por el Juez Presidente Sr. Cardozo tomamos el siguiente extracto:

"Se arguye que el accidente no ocurrió como consecuencia del empleo ni en el curso del mismo. Creo que ése es un criterio demasiado conservador. Si Grieb hubiera sufrido el accidente durante horas ordinarias de trabajo, entonces no importaría que prestara sus servicios gratuitamente. Si los servicios prestados eran incidentales al negocio de su patrono y los mismos eran prestados a instancias de este último, tales servicios formarían parte del empleo, de conformidad con las disposiciones del estatuto. Cualquiera otra interpretación desalentaría a los empleados leales. *Hartz* v. *Hartford Faience Co.*, 90 Conn. 539, 97 Atl. 1020. En ese caso un empleado del departamento de embarques, cuyo deber era llevar los libros, prestó a iniciativa propia cierta ayuda en la entrega de mercancías. Su solicitud de compensación fué sostenida. No es menester que vayamos tan lejos. No es posible que dudemos que en el caso citado la reclamación hubiera sido válida si la costumbre o una súplica especial hubieran establecido la aprobación del patrono. El resolver lo contrario nos llevaría a conclusiones raras. No es concebible que se permita a un patrono pedir a un oficinista que ayude a los mecánicos a reparar máquinas peligrosas y entonces se le permita decir que toda vez que los servicios eran gratuitos, el obrero, al recibir lesiones está fuera del palio de la ley. En estos casos, por razón de la costumbre o de la solicitud hecha los deberes del empleado han sido ampliados. *Lane* v. *Lusty*, (1915) 2 K. B. 230; *Mann* v. *Glastonbury Knitting Co.*, 90 Conn. 116, 96 Atl. 368, L.R.A. 1916D, 86. Ya hemos dicho que al determinar la relación de patrono y empleado, el pago de sueldos no es la única norma. *De Noyer* v. *Cavanaugh*, 221 N. Y. 273, 116 N. E. 992. Debemos resolver lo mismo ahora.

"En su consecuencia es claro que si Grieb hubiera prestado sus servicios durante horas de oficina, ellos hubiesen sido incidentales a su empleo. Para controvertir esta premisa, es necesario resolver que los servicios dejaron de ser incidentales por haberse prestado en horas extraordinarias. Jamás podría ser así. La ley no exige que el empleado trabaje con su vista fija en el reloj. Los servicios prestados con espíritu de lealtad, después de horas de oficina, merecen la misma protección que los servicios prestados por el perezoso

o haragán. *Larke* v. *John Hancock Co.*, 90 Conn. 303, 308, 97 Atl. 320, L.R.A. 1916E, 584. Mas se arguye que toda vez que el empleado había finalizado su labor diaria y se había ido, y luego había regresado, sus derechos son distintos. No sabemos por qué regresó. Tal vez por pura curiosidad. Quizá la inesperada luz que vió en la fábrica fuera de horas de oficina le hizó creer que en beneficio de los intereses de su patrono era necesario hacer una investigación. Sea ello como fuere, al llegar allí vió que se estaba trabajando. Su patrono tenía ciertos cigarros listos para ser entregados, y preparaba la factura. Lo que Grieb entonces se propuso hacer con la aprobación de su patrono era tan parte de los negocios de éste como si Grieb lo hubiera realizado en plena luz del día. No sólo tenía que entregar los cigarros, sino también que cobrar el valor de los mismos. Ésa es la inferencia clara que ha de hacerse dada la solicitud que se le hizo de que llevara la cuenta consigo. Además, es una inferencia lógica que él esperaba regresar, y traer el dinero que cobrara, ya que no se llevó a sus amigos sino que los dejó en la fábrica. Qué distancia tenía que caminar, no la sabemos. No ha habido prueba respecto a dónde está situado el Hotel Amos. Nada hay que demuestre que el empleado hubiera tenido que pasar por allí de regreso a su hogar. No quiero decir que el caso hubiera sido distinto de haberse probado tales cosas. Baste decir que no están aquí envueltas. No es éste un caso en que el obrero va principalmente en asuntos propios o personales, y en el que tan sólo incidentalmente y de manera secundaria va a hacer algo en favor de su patrono. Todas las circunstancias tienden a la conclusión de que Grieb salió de la fábrica en la noche del accidente con el único fin de ayudar a su patrono a efectuar una transacción comercial. No fué por pura amistad sino la relación de patrono y empleado, lo que indujo al primero a solicitar la prestación de los servicios, y al último a prestarlos. Si semejantes servicios no son incidentales al empleo dentro del significado del estatuto, la lealtad y la buena disposición del empleado merecen poca o ninguna recompensa.

"No creo que la ley nos obligue a resolver semejante cosa. Un servicio no deja de formar parte de un empleo por ser ocasional o trivial. El 'Master of the Rolls' dijo en el caso de *McDonald* v. *Owners of Steamship Banana*, (1908) 2 K. B. 926, 929, lo siguiente:

" 'Si durante la noche yo le digo a uno de mis criados domésticos que lleve una carta a un amigo, y mientras se dirige a la casa de mi amigo o regresa de ella es arrollado por un vehículo', entonces bajo la ley inglesa hay derecho a compensación.

"Tal aseveración para la época en que se hizo era un mero *dictum,* pero un caso reciente de- la Cámara de los Lores (*Dennis* v. *White & Co.,* (1917) A. C. 479) que revisa todos los precedentes y elimina muchas distinciones sutiles, hace constar de manera clara que ese *dictum* fué correcto y justo. Véase también *Hughes* v. *Batt* (1915) S. C. 150, citado en *Dennis* v. *White & Co.,* supra, en la página 484. Interpretaremos y aplicaremos nuestro propio estatuto con el mismo espíritu amplio. No tengo dudas de que al ser así interpretado, el caso que nos ocupa cae dentro de sus disposiciones.

"Para llegar a esta conclusión, no es necesario que tratemos de dar una definición precisa o comprensiva de la palabra empleo. Es menester dejar tales problemas para que sean resueltos mediante el proceso de exclusión e inclusión en casos específicos más bien que por una 'regla fija'. *Stewart & Son* v. *Longhurst* (1917) A. C. 249, 258. Bastará decir que en este caso el empleado estaba al servicio general del patrono; que los servicios prestados fueron incidentales a los negocios del patrono; que los mismos eran servicios que el empleado estaba acostumbrado a prestar al serle tal cosa solicitada; y que tal gestión fué la causa de que él se hallara presente en la escalinata. Es lógico hacer la inferencia de que no fué por pura camaradería sino con motivo de las tácitas relaciones de patrono y empleado que el primero solicitó del último que le prestara un servicio y que este último accedió."

El de autos es un caso que está en la línea divisoria. A no ser por el hecho de que al obrero lesionado se le dijo que no recibiría tratamiento adicional a menos que trajera consigo en su próxima visita el informe del patrono, sería cuestión fácil decir—enfocando la cuestión desde el punto de vista del empleado—que el segundo viaje fué hecho con el "fin primordial" de obtener un nuevo tratamiento y que el obrero "tan sólo e incidentalmente y como cuestión colateral" realizaba "algo en beneficio de su patrono." Ninguno de los casos resueltos ha decidido que—cuando el desempeño de un servicio para el patrono es condición precedente a la realización del "fin primordial" del empleado al asumir el riesgo del camino—un accidente ocurrido en la carretera no surge en el curso del empleo. No estamos preparados para decir que, bajo las circunstancias del presente caso, el objetivo

final del empleado al realizar el viaje o la idea principal que bullía en su mente al momento de hacerlo como "fin primordial" es la única norma o el factor dominante al determinar el derecho de su viuda a percibir compensación. Quizá no iríamos demasiado lejos al decir—tomando aún en consideración tan sólo la actitud mental del empleado y eliminando el interés del patrono en la gestión—que el "fin primordial" de ese viaje fué la entrega del informe del patrono como un requisito previo e indispensable a la obtención de nuevas curas. De todos modos, el interés directo del patrono en la entrega de su informe tenía alguna importancia sobre la cuestión de "fin primordial" y no debe ser pasado por alto.

El artículo 13 de la "Ley de Compensaciones por Accidentes del Trabajo" (Leyes de 1935, (1) págs. 253, 291) lee en parte como sigue:

"Todo patrono deberá llevar un registro de las lesiones graves o leves recibidas por sus obreros o empleados en el curso de su ocupación, o de aquellas enfermedades que protege la ley. Dentro de los cinco días después de ocurrir un accidente deberá el patrono presentar un informe escrito al Administrador del Fondo en blancos suministrados por éste. Dicho informe contendrá el nombre y la naturaleza de la ocupación del obrero o empleado, jornal que ganaba, la situación del establecimiento, el nombre, edad, sexo y ocupación del obrero o empleado lesionado, indicará la fecha y hora de cualquier accidente que haya causado la lesión, la naturaleza y causa de la lesión y cualquier otra información requerida.

"Los patronos que rehusaren o descuidaren hacer los informes requeridos por este artículo serán castigados por la corte municipal donde reside el patrono, con una multa que no excederá de cien (100) dólares."

En este caso el obrero lesionado inició su segundo viaje tres días después de haberle ocurrido el primer accidente. Si el patrono no hubiera hecho su informe para aquel entonces o dos días más tarde, él hubiera sido culpable de un delito menos grave. Desde su punto de vista, por lo menos, el "fin

primordial'' del viaje fué la entrega del informe. No tene-
mos razón para creer que no se le hubiera dicho al obrero
**lesionado que hiciera el viaje aún si**—por falta de confianza
en el practicante a cargo del dispensario o por cualquier otro
motivo—él hubiera abandonado su intención de regresar para
que se le curara nuevamente. Fué enviado en ambas oca-
siones por su patrono—la primera vez con una nota informal
y la segunda con el informe del accidente preparado por el
patrono. Al preguntársele al patrono por qué el empleado
fué a Corozal, contestó: ''A llevar el informe patronal y
curarse.'' No hallamos en los autos base **satisfactoria alguna**
para revocar la resolución de la Comisión Industrial en la
teoría de que el ''fin primordial'' del viaje fué someterse a
un nuevo tratamiento más bien que el entregar el informe del
patrono.

En otro respecto, éste es también quizá un caso que está
en la línea divisoria. El obrero se **dedicaba a cortar cañas**
de azúcar poco antes de las cuatro de la tarde de un viernes
cuando un pie le resbaló y tropezó con la punta de un tocón
de caña o con algún otro objeto. Ello dió por resultado una
herida incisa o puntazo en la planta del pie. En la mañana
del sábado su patrono le envió a Corozal con una nota diri-
gida al practicante encargado del dispensario. Llegó a Coro-
zal ya entrada la mañana y regresó a su hogar en la tarde
del mismo día. El lunes por la mañana su patrono lo mandó
nuevamente a Corozal con el aviso formal del accidente. La
inferencia es que de no haber muerto en la mañana del lunes,
el obrero hubiera regresado a su trabajo unos días más tarde,
o tan pronto lo permitiera el estado de su pie. Él había
estado cortando cañas por espacio de unos doce días y había
estado empleado durante unos seis meses con anterioridad
a la fecha del accidente. No sólo era un empleado sino que
también compraba cuanto su patrono necesitaba. Tal vez
técnicamente—y temporalmente por lo menos—el finado no
estaba empleado como un obrero corriente en el cañaveral

con posterioridad al día del accidente. Sin embargo, al siguiente día, sábado, y el lunes, estuvo dedicado a otras labores, al igual que lo había estado con anterioridad a la época en que comenzó a trabajar en el cañaveral. Aún estaba al servicio de su patrono. El servicio prestado era incidental al negocio. ''No fué la mera amistad sino la relación de patrono y empleado lo que indujo al primero a solicitar los servicios del último y al último a prestarlos . . . . Es lógico hacer la inferencia de que no fué por pura camaradería sino con motivo de las tácitas relaciones de patrono y empleado que el primero solicitó del último que le prestara un servicio y que este último accedió.'' *Grieb* v. *Hammerle, supra.*

*La resolución de la Comisión Industrial debe ser confirmada.*

El Juez Asociado Sr. Travieso no intervino.